**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**ANDREA R. TREVINO**
Beckman Lawson, LLP
Fort Wayne, Indiana

ATTORNEY FOR APPELLEE:

**THOMAS W. EARHART**
Reed & Earhart Attorneys at Law, P.C.
Warsaw, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE: THE PATERNITY OF J.P., | ) |
| | ) |
| J.H., | ) |
| | ) |
| Appellant- Respondent, | ) |
| | ) |
| vs. | )  No. 43A03-1206-JP-300 |
| | ) |
| P.P., | ) |
| | ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE KOSCIUSKO SUPERIOR COURT
The Honorable Duane G. Huffer, Judge
Cause No. 43D01-0107-JP-182

**February 26, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**

J.H. ("Father") appeals the custody arrangement imposed by the trial court following his motion to modify custody. We remand.

**Issues**

Father raises two issues, which we restate as:

> I. whether the trial court's decision regarding the custody arrangement is clearly erroneous; and

> II. whether the trial court erred by not ruling on his contempt petitions.

**Facts**[1]

Father, who lives in South Bend, and P.P. ("Mother"), who lives in Warsaw, are the parents of J.P., who was born on June 15, 2001. In 2002, paternity was established, Mother was awarded custody of J.P., and Father was awarded parenting time. In 2006, Mother filed a motion to modify support and to determine child support arrearages. After the filing, the relationship between Mother and Father became contentious. At one point, Father threatened "to put a bullet through Mother's head," and Mother obtained a protective order against Father. App. p. 150. Following a hearing, Father's arrearage was determined to be $177.50, and the trial court suggested that Mother and Father participate in counseling.

At an initial meeting with a counselor, Father admitted that he had made the threat to Mother and "started crying and informed the counselor that he wouldn't hurt his

---

[1] In her brief, Mother requests that a 2006 letter written by Father's girlfriend to the trial court be stricken. Because this letter is not relevant to our decision on appeal, we deny Mother's request.

child's Mother and then stated that he would not attend any additional appointments and left the session." Id. Mother then requested and received an escort to her car, and Father was in the parking lot in his vehicle when Mother was escorted to her car.

In September 2006, Mother filed a motion to modify parenting time. After a November hearing, the court ordered Mother and Father to undergo psychological examinations and awarded Father additional parenting time to make up for parenting time withheld by Mother. The examinations were performed, and reports were filed with the trial court. Also in November 2006, Father was arrested for invasion of privacy after he called Mother's cell phone. That charge was later dismissed.

During 2007 and most of 2008, Father exercised parenting time without incident. In November 2008, Mother took J.P. to Parkview Behavioral Health in Fort Wayne complaining that J.P. wanted to stab herself with scissors. All of the intake information was given by Mother. J.P. was diagnosed with depressive disorder, and Mother informed Father of J.P.'s hospitalization the next day. Upset regarding the hospitalization, Father went to the hospital and demanded to know why J.P. was being treated. Father was described as offensive, argumentative, and very rude, and was escorted from the hospital.

After J.P.'s release from the hospital, Father attempted to arrange parenting time for the Thanksgiving holiday, but Mother informed Father that she had made other plans for J.P. and did not allow Father to exercise his parenting time. During Father's parenting time over the Christmas holiday, J.P. had an argument with a friend. J.P., upset about the argument, called Mother crying. Mother responded by calling the South Bend

3

Police, who conducted a welfare check at Father's home. The police told Mother not to pick J.P. up from Father's house.

Over Christmas 2009, Father, Father's girlfriend, and J.P. traveled to Colorado for a ski trip. On the return trip, Mother called Father, who was in Iowa, demanding to know the time of their arrival in Indiana. Over Christmas 2010, Father, his girlfriend, and J.P. again traveled to Colorado for a ski vacation. Following their return, Mother began denying Father parenting time.

On February 1, 2011, Father filed a contempt petition based on Mother's refusal to allow parenting time. On March 4, 2011, Mother and Father stipulated that Father would not have contact with J.P. until approved by a therapist. Mother and Father were eventually referred to therapist Gayle Bevill-DaDa. Between March 10, 2011, and April 8, 2011, all of the information given to Bevill-DaDa regarding Father was provided by Mother. Based on the information she had received from Mother, Bevill-DaDa thought Father was a very dangerous person. When Bevill-DaDa first met with Father, she made arrangements to have male staff present because she was fearful of Father. During the meeting, Bevill-DaDa determined that Father was not as Mother had described and questioned whether the situation could involve parent alienation syndrome initiated by Mother.

On May 3, 2011, Father forwarded an email to all of his friends, including Mother, about the capture of Osama Bin Laden. The email included a picture of Bin Laden with a bullet hole through his eye and the statement, "'Subject: Bin Laden Warning!!! Very

4

graphic, but proof.' 'Remember, he was shot with two bullets above the left eye!! Looks real to me.'" Id. at 154.

On May 13, 2011, Bevill-DaDa coordinated a visit between J.P. and Father, which went well. Shortly after that visit, on May 19, 2011, Mother reported to the Department of Child Services ("DCS") that J.P. had been sexually abused by Father. DCS did not substantiate these allegations and encouraged J.P. to be evaluated by a therapist. Instead of involving Bevill-DaDa, Mother took J.P. to another therapist.

On June 3, 2011, Father filed a motion for emergency custody, a contempt petition based on Mother's cancellation of an appointment with Bevill-DaDa, a motion to modify child support, and a motion for psychological evaluation. On June 6, 2011, Father filed a motion to continue counseling.

On June 10, 2011, Mother met with Bevill-DaDa, who had been informed of the sexual abuse allegations and who was concerned about the timing of the allegations. After several meetings with J.P. and Mother, Bevill-DaDa was unable to substantiate the allegations.

On July 18, 2011, the parties entered into a stipulation, agreeing to place J.P. with her paternal grandparents in South Bend for a four-week period. The parties agreed not to have any direct or indirect contact with J.P. except for counseling sessions. Mother and Father were permitted to talk to J.P. by phone.

Prior to her placement with her grandparents, J.P. was melancholy and sullen. After a short stay with her grandparents, J.P. was "bubbly and outgoing" and "had a complete change in demeanor when removed from Mother's care." Id. at 155. J.P.'s fear

of Father subsided within five days of not having contact with Mother. Bevill-DaDa eventually determined that, when J.P. stated that Father yelled at her, he was actually reprimanding and instructing her.

On August 11, 2011, J.P. was placed with Mother's relative so she could attend the same school she had previously attended. At that time, Mother and Father were permitted to communicate with J.P. by phone, were allowed visitation, and were ordered to continue counseling with Bevill-DaDa. At one point, J.P. became homesick and walked from her school to Mother's house. Mother called her relative and, when the relative arrived, Mother and J.P. were crying. The relative contacted Bevill-DaDa, who spoke with J.P., and J.P. returned to the relative's house.

During an August 2011 counseling session, Mother became "hysterical" and was observed in the waiting room "in a fetal position, on the floor, crying." Id. at 155. During another session with Father and Mother, Bevill-DaDa discovered that Father was secretly recording the session without Mother's or Bevill-DaDa's permission. Father apologized to Mother at the next session. Despite his requests, Mother has not given Father school-related information.

After a November 2, 2011 hearing, J.P. was returned to Mother's custody, Father was given parenting time, and the parties were ordered to continue therapy with Bevill-DaDa. Father, his girlfriend, and J.P. again went to Colorado over Christmas 2011. Upon J.P.'s return, Mother took her to a doctor for ADD testing because J.P.'s teacher was purportedly concerned about J.P.'s attention. Mother did not inform Father or Bevill-DaDa of the teacher's concern or the doctor's appointment. Mother informed the

doctor that J.P. was having a lot of emotional problems at school and at home, that she was very depressed, and that she wanted to stay with Mother. The doctor questioned whether J.P. had ADD but diagnosed her with depression and referred her to another therapist. This doctor's report was not forwarded to Bevill-DaDa.

After Christmas break, the progress Mother, Father, and J.P. had been making began to regress. In March 2012, as things became worse, Mother received a voicemail from Father in which he stated that, if she refused to let him see J.P., "it would go down in history." Id. at 158. Father ended the message by saying, "'Say hi to your mommy.'" Id. Mother perceived this as threatening because her mother is deceased.

Another evidentiary hearing was conducted on April 10, 2012. Bevill-DaDa testified that it was in J.P.'s best interests that Father be awarded custody because Father has been more appropriate with teaching J.P. coping skills and values. On May 31, 2012, the trial court issued a fourteen-page order, which included detailed findings regarding the strained relationship between Mother and Father and Bevill-DaDa's assessment of the family dynamics. For example, the trial court found:

> 54. Therapist Gayle Bevill-Dada is of the professional opinion that Father can be the best parent. Mother cannot cope, cannot manage Child's behaviors as to values, ethics and manners. There is no direction by Mother to [J.P.] if [J.P.] would remain with Mother. It would not be in [J.P.'s] best interest because past conduct of Mother is the best indication of conduct in the future. Neither Mother nor Father can overcome issues for the sake of the child; however, Father has encouraged Child-Mother relationship whereas Mother has discouraged Child-Father relationship. Therapist noted that [J.P.] did want to live with Mother; however, such is to be expected because that is what [J.P.] is used to. If [J.P.] remains with Mother, Child will continue to

7

have fearfulness of Father. Further, that the Child is happy and effervescent when not in Mother's custody, but is sullen and melancholy when in Mother's custody.

\* \* \* \* \*

61.     Mother had been hospitalized three (3) times for mental health issues. Mother has attempted suicide, the last attempt being in 1999. Mother regularly sees a psychiatrist. Mother has an occasional panic attack; has mood disorder; and is prescribed anti-anxiety medication.

62.     Father has been described and is found to be overbearing, tenacious, arrogant, demanding and pushy. Father does not have mental illness. Father does need counseling, but will not accept that he needs counseling.

63.     Therapist Gayle Bevill-Dada was shown in open court in April 2012 the picture of Osama Bin Laden with message transmitted by Father to Mother by e-mail. Therapist was surprised and shocked at same, which gave her pause. Therapist was not made aware of the voicemail from Father to Mother stating, in part, "Say hi to mommy."

Id. at 158-59.

The trial court concluded:

> There has been a change in circumstances so substantial and continuing as to affect the best interest of [J.P.]. [J.P.] is torn between her parents. [J.P.] is a child, parent and teacher.
>
> Mother has communicated to [J.P.] Mother's intense dislike of Father. Mother has denied verbal communication with [J.P.] concerning Father, but Mother is quite capable by her expression and body language of communicating her feelings to [J.P.]. Mother has intentionally withheld visitation of [J.P.] from Father. Mother has abused her position of trust with [J.P.] by her conduct in suggesting child molestation by Father of [J.P.]. Mother has disobeyed this Court's Order as to visitation and of keeping Father informed of all reports from school.

8

The Court gives great weight to the testimony of Gayle Bevill-Dada. If [J.P.] remains in the sole custody of Mother, it would be adverse to [J.P.'s] development and well-being.

The Court, however, determines that Gayle Bevill-Dada has not given adequate consideration to the horrible threats made by Father to Mother over several years. Father's threats to Mother have greatly harmed Mother's well-being and ultimately, [J.P.'s] well-being.

If such a choice could be made, the choice would be that neither Mother nor Father would rear [J.P.] because of Mother and Father's horrible conduct. There is no de facto guardian of [J.P.], however. Mother and Father brought [J.P.] into the world. [J.P.] will either be the worst of both or the best of both.

In order to strive for the best interest of [J.P.] so that she may possibly be a well-rounded, healthy individual, custody of [J.P.] should be divided between Mother and Father in approximately six (6) consecutive months per year.

Id. at 159-60. The trial court's order included details regarding the custody and visitation arrangements[2] and child support. The trial court ordered each party to pay his or her own attorney fees and did not specifically address Father's contempt petitions. Father now appeals.

## Analysis

### I. Custody

Father argues that the trial court's decision awarding both parents split custody is clearly erroneous. It appears that the trial court entered its findings and conclusions sua sponte. Under the circumstances, special findings entered by the trial court sua sponte

---

[2] The trial court ordered that Father shall have custody from June through December and that Mother shall have custody January into June. The trial court specified that, while J.P. is not in his or her custody, Mother and Father shall have parenting time pursuant to the Indiana Parenting Time Guidelines. Neither party makes a specific argument regarding the practicality of this arrangement or the desirability of J.P. attending school in South Bend for half the year and in Warsaw for the other half of the year.

9

control only as to the issues they cover. Harrison v. Thomas, 761 N.E.2d 816, 819 (Ind. 2002). "As to issues on which the trial court has not made findings, or on which the findings are inadequate, we treat the judgment as a general one and we examine the record and affirm the judgment if it can be sustained upon any legal theory the evidence supports." Id. As to the findings the trial court did make, we first must determine whether the evidence supports the findings and then whether those findings support the trial court's conclusions. Yanoff v. Muncy, 688 N.E.2d 1259, 1262 (Ind. 1997). Findings will only be set aside if they are clearly erroneous, which occurs only when the record contains no facts to support them either directly or by inference or if the trial court applies the wrong legal standard to properly found facts. Id. "In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made." Id.

We neither reweigh the evidence nor reassess witness credibility, and we view the evidence most favorably to the judgment. Best v. Best, 941 N.E.2d 499, 502 (Ind. 2011). "Appellate deference to the determinations of our trial court judges, especially in domestic relations matters, is warranted because of their unique, direct interactions with the parties face-to-face, often over an extended period of time." Id. "Thus enabled to assess credibility and character through both factual testimony and intuitive discernment, our trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the involved children." Id.

Bevill-DaDa testified that it was in J.P.'s best interests to live with Father permanently. Although the trial court gave great weight to Bevill-DaDa's testimony, it

10

concluded that Bevill-DaDa had not given adequate weight to the threats Father had made to Mother over the years.[3] Father takes issue with the trial court's findings and conclusions about the purported threats. He argues that the findings are not accurate and should not be a basis for undermining Bevill-DaDa's recommendation and awarding split custody, as opposed to full custody, to Father. Mother responds by asserting that Father is asking us to reweigh the evidence and that the record is replete with examples of Father's misconduct, misbehavior, and threats.

Although we are not permitted the reweigh the evidence, we cannot overlook the fact that the trial court's finding does not accurately reflect the evidence. The trial court found:

> 63. Therapist Gayle Bevill-Dada was shown in open court in April 2012 the picture of Osama Bin Laden with message transmitted by Father to Mother by e-mail. Therapist was surprised and shocked at same, which gave her pause. Therapist was not made aware of the voicemail from Father to Mother stating, in part, "Say hi to mommy."

App. p. 159.

Regarding the email, Father testified that he had received the email and forwarded it to all of his friends, including Mother, without adding any message. Moreover, when the trial court questioned Bevill-DaDa about the email, the trial court stated, "Now that gives me pause." and she responded, "Mmmm, yes, I understand." Tr. p. 400. She went on to testify, "I understand why you would be concerned, I'm concerned about this. I

---

[3] To the extent Father argues that the evidence does not support the trial court's conclusion that the threats ultimately harmed J.P.'s well-being, we believe it can reasonably be inferred that the harm caused to Mother by Father's conduct negatively impacted J.P.

11

think it's very inappropriate." Id. The trial court continued to question Bevill-DaDa as to whether the email gives her pause regarding her custody recommendation. She reiterated that it was inappropriate and cause for concern but explained that people make statements out of frustration and that Father "has a very difficult personality" and can get "fighting mad when somebody tries to keep him from his daughter." Id. at 403. However, at no point during the trial court's questioning did Bevill-DaDa change her recommendation that Father be awarded custody. Ultimately, based on our review of the record, we are concerned that this finding does not accurately reflect Bevill-DaDa's testimony regarding the email.

This concern is heightened by the fact that the last part of this finding—that Bevill-DaDa was not made aware of the voicemail from Father to Mother—is contrary to the evidence. At the hearing, Bevill-DaDa testified about Mother's tendency to portray Father as a sociopath and discussed the voicemail. Bevill-DaDa stated:

> Even more recently within the last two months there was a phone call from [Mother] that [Father] had threatened her life again, and I said what, what happened? She said that he said you need to say – you'd better say hi to your mommy. When I asked [Father] in session about that, he looked at me as if I'd lost my mind. He was totally taken aback from that. He had no idea what I was talking about. No idea. And I believe that was a genuine response. It was like a – what? He had no idea. So the projection that [Father] is this horrible monster I don't think is accurate.

Id. at 385. Even if Mother accurately perceived the voicemail as threatening, it is clear that, contrary to the trial court's finding, Bevill-DaDa was made aware of the voicemail

12

and even addressed the issue with Mother and Father and that she nonetheless recommended that Father have custody of J.P.

Certainly, the trial court was free to determine that Bevill-DaDa had not given adequate consideration to Father's threats. However, because of the great weight the trial court gave to Bevill-Dada's testimony overall, which presumably included her recommendation that Father be awarded custody of J.P., and the inaccuracies in the finding regarding the threats, we remand for the trial court to reconsider Bevill-DaDa's testimony regarding the threats and to determine whether Bevill-DaDa gave them adequate consideration. If the trial court revises its conclusions regarding Bevill-DaDa's assessment of the threats, the trial court should determine the impact, if any, of its revised conclusion on its decision to split custody between Mother and Father.

## II. Contempt

On January 29, 2011, Father filed a motion for contempt based on Mother's failure to allow parenting time and, on June 3, 2011, Father filed another motion for contempt based on Mother's cancellation of counseling appointments with Bevill-DaDa. In its order the trial court concluded, "Mother has disobeyed this Court's Order as to visitation and of keeping Father informed of all reports from school." App. p. 160. The trial court's order, however, does not otherwise address the issue of contempt.

"A party that is willfully disobedient to a court's order may be held in contempt of court." Witt v. Jay Petroleum, Inc., 964 N.E.2d 198, 202 (Ind. 2012). It is soundly within the discretion of the trial court to determine whether a party is in contempt. Id. "It lies within the inherent power of the trial court to fashion an appropriate punishment for

13

the disobedience of its order." MacIntosh v. MacIntosh, 749 N.E.2d 626, 631 (Ind. Ct. App. 2001), trans. denied. "Sanctions in a civil contempt proceeding may seek both to coerce behavior and to compensate an aggrieved party." Id.

Mother contends that the issues raised by Father in the contempt motions were dealt with in the March 2011 and July 2011 stipulations. Although the stipulations did address the issues of visitation and counseling prospectively, they did not address Mother's alleged disregard of the trial court's orders. Because the issue of contempt was not expressly resolved by the trial court, we remand with instructions to consider Father's contempt motions and rule on them accordingly.[4]

## Conclusion

Because it is not clear the extent to which the inaccuracies shown in finding 63 affected the trial court's conclusion regarding Bevill-DaDa's consideration of Father's threats, we remand for the reconsideration of the evidence as it relates to Bevill-DaDa's assessment and knowledge of the threats. We also remand for resolution of Father's contempt petitions.

Remanded.

BAKER, J., and RILEY, J., concur.

---

[4] To the extent Father asks us to enter a finding of contempt, trial courts possess unique knowledge of the parties before them and are in the best position to determine how to maintain their authority, justice, and dignity and whether a party's disobedience of the order was done willfully. See Witt v. Jay Petroleum, Inc., 964 N.E.2d 198, 203 (Ind. 2012). To the extent Father summarily asks us to award appellate attorney fees, this request is not supported with cogent argument and citation to legal authority and is waived. See Ind. App. R. 48(A)(8)(a).